| LARIMER COUNTY DISTRICT COURT STATE OF COLORADO<br><br>201 LaPorte Ave<br>Fort Collins, CO 80521 | DATE FILED: May 3, 2023 7:48 PM<br>FILING ID: 78E2E7378B119<br>CASE NUMBER: 2023CV30357 |
|---|---|
| **DERRICK GROVES,**<br>Plaintiff,<br><br>**v.**<br><br>**CITY OF FORT COLLINS,**<br>**JASON HAFERMAN**,<br>**SERGEANT ALLEN HEATON**, and<br>**CORPORAL REDACTED**,<br>Defendants. | ▲ **COURT USE ONLY** ▲<br><br>Case Number:<br><br>2023CV |
| *Co-counsel for Plaintiff:*<br>Sarah Schielke, #42077      P: (970) 493-1980<br>The Life & Liberty Law Office   F: (970) 797-4008<br>1209 Cleveland Avenue<br>Loveland, CO 80537<br>sarah@lifeandlibertylaw.com<br><br>Matthew Haltzman, #47913    P: (970) 692-3440<br>Haltzman Law Firm, P.C.      F: (970) 797-2419<br>204 Maple Street, Unit 101<br>Fort Collins, CO 80521<br>matthew@haltzmanlaw.com | Division: |
| **COMPLAINT AND JURY DEMAND** | |

COMES NOW the Plaintiff, Derrick Groves, by and through the undersigned counsel, with this *Complaint and Jury Demand* and in support of the same, respectfully submits as follows:

### INTRODUCTION

1. Plaintiff brings this civil rights action pursuant to § 13-21-131, C.R.S. and 42 U.S.C. § 1983 and 1988 for various forms of relief, to include compensatory damages and attorney's fees, stemming from Defendants' violations of Plaintiff's rights guaranteed by the Fourth and Fourteenth Amendments to the Constitution of the United States and Article II, Section 7 of the Colorado Constitution.

2. The Court has jurisdiction over Plaintiff's claims pursuant to § 13-21-131, C.R.S., § 13-1-124(1)(b), C.R.S., because the acts giving rise to the claims were committed in the State

of Colorado, and pursuant to state court supplemental jurisdiction over the federal claims arising out of 42 U.S.C. § 1983.

3.  Pursuant to C.R.C.P. 98(c)(5), venue is proper in this Court, which Plaintiff designates as the place of trial for this action.

4.  Jurisdiction supporting Plaintiff's claim for attorney's fees is conferred by 42 U.S.C. § 1988 and § 13-21-131(3).

5.  All of the event described herein occurred in the Town of Fort Collins and the State of Colorado.

## PARTIES

6.  Plaintiff Derrick Groves is, and at all times relevant to this Complaint has been, a resident of the State of Colorado. He currently resides in Loveland, Colorado.

7.  Defendant (former) Fort Collins Police Officer Jason Haferman ("Officer Haferman") was at all times relevant to this complaint duly appointed and sworn as a police officer working for Fort Collins Police Services. Upon information and belief, Defendant Haferman has resigned from FCPS but has retained his P.O.S.T. certification in Colorado and continues to work in law enforcement. Haferman is a named Defendant in his individual capacity.

8.  Defendant City of Fort Collins is a governmental entity and municipality incorporated under the laws of the State of Colorado for purposes of liability under 42 U.S.C. § 1983 and the Fort Collins Police Services is a department of City of Fort Collins. Defendant City of Fort Collins enforces local and state law through its law enforcement agency, the Fort Collins Police Department ("FCPS").

9.  At all times relevant to this Complaint, Defendant City of Fort Collins employed and was responsible for the oversight, supervision, discipline and training of FCPS personnel, including Officer Haferman, Sergeant Heaton, and Corporal Redacted.

10. Defendant City of Fort Collins was also, at all times relevant to this Complaint, the body responsible for FCPS's official policies and practices as well as FCPS's unofficial customs and practices with respect to DUI arrests and probable cause.

11. Defendant Sergeant Allen Heaton was responsible for supervising Officer Haferman over the period that he made the repeated wrongful DUI arrests at issue in this Complaint, and also personally participated in or otherwise observed several of the wrongful DUI arrests preceding Plaintiff's arrest. Defendant Heaton is sued in his individual and official capacities.

12. Defendant  Corporal ▮▮▮▮▮▮▮ , whose true name is currently unknown, is a Corporal at FCPS who at all times relevant to this complaint was duly appointed and sworn as a police officer working for Fort Collins Police Services. FCPS has claimed in documents such as the 68-page internal investigation report regarding Officer Haferman that this Corporal was responsible for supervising Officer Haferman during the period of Haferman's repeated wrongful DUI arrests. It is unclear why FCPS has redacted Haferman's supervising Corporal's name from publicly released documents regarding

Officer Haferman. Upon information and belief, Corporal Redacted's name will be easily identified in the discovery process and so this Corporal will simply be referred to as "Corporal Redacted" until that time. Corporal Redacted is sued in his individual and official capacities.

## STATEMENT OF FACTS

13. Officer Haferman began working at FCPS in 2017 as a patrol officer.

14. Even as a normal patrol officer, Officer Haferman immediately established himself as a prolific arrester for DUI offenses.[1] In fact, he accumulated so many DUI arrests in his first two years working at FCPS as a regular patrol officer that in 2020, FCPS decided to promote him to their "DUI Officer," which meant his primary daily objective every time he worked was to ignore all other regular calls for service and instead spend his shift seeking out and charging as many drivers as possible with DUIs.

15. FCPS, like most other Colorado law enforcement agencies, had great incentive to create positions like "DUI officers" and fill those roles with individuals like Haferman because grant funding at both the state and federal levels was allotted to agencies through reasoning that takes into account the quantity of DUI arrests that agency had made in preceding years. The more DUI arrests an agency made each year, the more the agency would profess DUI drivers to be a huge "problem" in their jurisdiction, and then the more grant funding they would receive to do DUI enforcement next year. The additional funding provided by these grants would typically pay for all of the hours worked by the agency's "DUI officer" (often at an elevated overtime hourly rate) and would also go to fund more equipment and officers for the agency itself, in effect, enabling the department to increase its annual budget on its own. Various agencies like MADD (Mothers Against Drunk Driving) would also give awards and extensive positive publicity to agencies that had officers making abundant DUI arrests, which was of course quite also desirable to both agency and officer for enhancing their respective images in the eyes of the public.

16. Due to the foregoing, FCPS was eager to put its most prolific DUI charging officer in the role of "DUI Officer" whenever possible. Haferman applied for this position and because he had already shown such promise in making so many DUI arrests in his normal patrol shift, in May of 2020, FCPS gave him the job.

17. At the same time, the coronavirus pandemic had just struck. Bars and restaurants all closed and other recreational events like concerts and festivals were all cancelled. This brought DUI enforcement (and much of the public's driving generally) to a near standstill for several months, as there were concerns about the safety of breath testing or housing DUI offenders in jails due to the virus's known propensity for spreading in respiratory droplets in poorly ventilated spaces.

18. A vaccine was developed and began to be distributed to the public at the end of 2020. Much of the economy began to reopen and people began resumption of more normal

---

[1] Colorado has several DUI-type offenses (DUI, DWAI, DUI *per se*, and DUI-Drugs). The impact and import of a citizen being charged with any of those DUI-type offenses is nearly identical and so for ease of reference the term "DUIs" as used herein is meant to encompass all such offenses unless otherwise specified.

commuting and public gatherings. Law enforcement agencies like FCPS directed their officers to return to normal practices for DUI enforcement.

19. Officer Haferman was eager to show his superiors at FCPS that he was going to be the most prolific DUI officer they had ever had since the position was created. Upon information and belief, only some of which is detailed herein, he began regularly stopping cars without reasonable suspicion and making arrests without probable cause very early on in his stint as FCPS's DUI officer.

20. On one such occasion, on November 27, 2020, Officer Haferman stopped and harassed the occupants of a vehicle merely because he believed the driver had had prior law enforcement contacts. He detained the driver and its occupants with no legal basis for an extended period of time, forcing them unlawfully to wait for a K9 unit to arrive to search their vehicle. The driver, Jacob Larkin, later filed a motion to suppress the stop due to this illegal detention. At the suppression hearing, Officer Haferman admitted he was not a trained DRE (Drug Recognition Expert) but he claimed to be able to diagnose Mr. Larkin as "being under the influence of narcotics" because he looked tired. The Larimer County District Court, in finding that Haferman's detention of Mr. Larkin was in fact unlawful and a violation of the Fourth Amendment, noted that "not even a DRE, 12-step protocol, based on mere observations of the subject in a few minutes, in the dark, while engaging in a conversation with another individual [as Haferman testified] could reach such a conclusion." The Court also stated in its written ruling that in Mr. Larkin's case "there are multiple obvious and logical reasons that were not explored [by Haferman] in any manner," all of which "negate[d] any reasonable assumption that a crime has or is about to occur."

21. The Judge also ruled in the Larkin case that Haferman was unreasonable in characterizing so many various aspects of very normal human behavior like "being on edge about being contacted by police" as grounds to continue seizing the person in violation of the Fourth Amendment. Most importantly, the Court, after hearing Haferman's testimony, openly questioned the veracity of Haferman's testimony. As the Court wrote: "Officer Haferman testified he was certain it was multiple [prior law enforcement] contacts [in defendant's history]; however, the Court questions the accuracy of such when the rest of [Haferman's] testimony regarding this point was incredibly non-specific and couldn't distinguish the research regarding Mr. Larkin versus [the passenger]." The Court held that Haferman's continued detention of Mr. Larkin was thus "unquestionably unconstitutional" and all the evidence in the case was suppressed.

22. Thus by early 2021,[2] at basically the inception of his tenure as "DUI Officer," FCPS had notice that Haferman was engaging in wrongful searches and seizures of citizens. But FCPS did nothing.

---

[2] Upon information and belief, Haferman had several wrongful DUI arrests prior to 2021 however Fort Collins has endeavored not to answer questions or provide in any timely fashion records in response to requests from defense counsel or the media related to those arrests. The various wrongful DUI arrests set forth in this Complaint are thus based on very incomplete records and not meant to be a comprehensive accounting of all the notice attributable to FCPS regarding Haferman's wrongful and unconstitutional arrest decisions.

23. Haferman received the same training as any other officer with respect to the administration of SFSTs (Standardized Field Sobriety Tests). Yet, immediately, Haferman began administering SFSTs to subjects in a manner that was entirely inconsistent with his training and designed to create a false impression of the subject's intoxication when described by him in his reports.

24. Most critically, all of the defects in Haferman's administrations of roadside tests were abundantly observable on video. They included, and are not limited to:

    a. Haferman regularly interpreted normal human behaviors as "cues" or "clues" of impairment when his training instructed the opposite.

    b. Haferman regularly claimed that his training supported his claims of other innocuous human behaviors being indications of impairment when no such training or scientifically-backed validation data existed.

    c. Haferman also regularly administered the Horizontal Gaze Nystgamus (HGN) test to people completely wrong, and would then falsely claim that what he observed in his HGN administration on the subject supported his arrest decision.

25. Haferman also by early 2021 was regularly writing reports containing lies and exaggerations regarding the claimed observed indications of impairment, regularly controverted by his or his cover officers' own videos.

26. Haferman also by early 2021 was regularly muting and deactivating his bodyworn camera during his citizen contacts and arrests, in violation of FCPS policy and Colorado law.

27. All of the issues described in the three preceding paragraphs were observable on video. In other words, if *anyone* at FCPS were supervising Haferman during this time and had watched just one of his (or his cover officer's) videos of his SFST administration, or compared one of his videos to his written reports, they would have immediately identified all of the foregoing problems. They were plain and obvious.

28. Either no one was supervising Haferman at FCPS, or, someone was, and they just did not care to intervene.

29. Upon information and belief, at least one of the individuals personally responsible for supervising Haferman during this period was Corporal Redacted.

30. Corporal Redacted has admitted in an IA investigation into Haferman that early on in his period of having the duties of supervising Haferman and reviewing his work (January 2021 through May 2022), he noticed that Haferman was counting as a clue of impairment on one of the standardized roadside tests something that was not a clue of impairment at all. Specifically, Haferman was claiming subjects to show impairment on this maneuver if they didn't count to 30 during the 30-second-timed one-leg stand maneuver.

    a. It is expressly included as part of the standardized field sobriety training provided by NHTSA on how to administer roadsides the admonition that what the subject counts to while being timed holding their leg up for 30 seconds is irrelevant.

Particularly since they are instructed to count in "one-one-thousand, two-one-thousand" fashion which is almost always considerably slower than the rate that seconds elapse in real time.

b. Corporal Redacted saw that Haferman was repeatedly stating subjects were failing and/or showing impairment clues on the one-leg stand test because of this clue that he had not just made up, but which the NHTSA manual in fact told him expressly *not* to consider a clue.

c. Corporal Redacted, noticing this, confronted Haferman about his repeated misrepresentation of impairment evidence against people he had arrested in his DUI reports. He told him it was not an impairment indicator and he needed to stop using it as one.

d. Haferman did not respond by acknowledging this as a mistake, however. Instead, Haferman told Corporal Redacted, his superior, that this was "an advanced technique to indicate impairment." Corporal Redacted asked where such advanced training would have come from. Officer Haferman refused to say.

e. This was the first of many red flags to Corporal Redacted and FCPS about Officer Haferman.

f. Any reasonable supervising officer knows that police officers making DUI arrests compile most, if not all, of their "evidence" of the driver's impairment by having them do roadside tests which are supposed to be standardized and done according to training. Any reasonable supervising officer would recognize that if a subordinate police officer was making up his own "advanced" impairment detection clues on these tests and then making arrest decisions based on such nonsense (and having the audacity to tell his corporal that he wasn't violating the NHTSA training manual, he was just doing something "advanced"), that this would create an unacceptably high probability of that officer wrongfully arresting innocent people and almost certainly disregarding other critical components of police work.

g. Any reasonable supervising officer in this situation, after hearing Haferman's completely absurd claim that the impairment clues he used in violation of his training saying otherwise were simply "advanced" impairment clues, would have *at a minimum* taken an hour or two to review Haferman's DUI arrest videos (particularly in any one of the many "none detected" or extremely low BAC DUI arrest cases that Haferman had had up to that point) and see if Haferman was doing other roadsides correctly and if he was reporting the facts accurately in his reports.

h. Any reasonable supervising officer in this situation also would have recognized that Haferman treating this non-clue as an impairment clue could have contributed to prosecutors prosecuting DUI cases they would not have otherwise prosecuted or citizens pleading to crimes they did not commit, due to the false claims in Haferman's report on this maneuver. Any reasonable supervising officer in this situation would have at least generated a supplemental report in all the cases where Haferman listed this non-clue as evidence of impairment, correcting that

misimpression, so that those individuals affected by it could be notified and make important decisions in their cases in light of it accordingly. Particularly since Haferman's inclusion of this non-clue as a clue also had considerable bearing and impact on his credibility and reliability as a DUI investigator.

  i.  Corporal Redacted did none of these things. He just told Haferman to stop using the non-clue as a clue and until Haferman went under investigation for multiple, repeated wrongful DUI arrests a year later, he never even spoke to anyone of it again.

31. On January 21, 2021, Officer Haferman made his next wrongful arrest, this time of C.B.[3] Like he did in all his DUI arrest reports (see *infra*), he included false and exaggerated claims of the driver having "overall slow behavior," "droopy eyes," and failed roadside maneuvers. C.B. even blew into a PBT on scene (Portable Breath Test) and the result was triple zeroes (0.000 BAC). But Haferman arrested her anyway and charged her with DUI.

  a.  Review of the bodyworn camera (BWC) videos from C.B.'s arrest reveals multiple discrepancies between what actually occurred and what Officer Haferman alleged about her in his report.

  b.  Haferman listed C.B. having "droopy eyes" as an indication of impairment even though she literally explained to him she had a medical condition (blepharoptosis) that caused her to have droopy eyes.

  c.  Review of the BWC video from C.B.'s arrest reveals yet another occasion on which Haferman muted his BWC for nearly the entirety of his contact, in violation of FCPS policy and Colorado law. It is obvious from his video that this tampering was deliberate, as Haferman reactivates his audio for brief a 13-minute period in the middle of the 90+ minute video before muting it again.

  d.  It is obvious from the videos in C.B.'s arrest that Haferman is administering the HGN to C.B. incorrectly and claiming in his report HGN "clues" that did not exist.

  e.  On March 19, 2021, C.B.'s blood test results came back negative for alcohol and negative for all drugs of abuse.

  f.  On March 20, 2021, Haferman reviewed the blood test results and entered them into C.B.'s case.

  g.  That same day, at least one of Haferman's supervising officers, Defendant Sergeant Allen Heaton, claims to have reviewed Haferman's arrest and the negative blood test results and approved of both.

---

[3] To protect the privacy of individuals who have been victims of Officer Haferman's wrongful arrests but who have not yet chosen to come forward publicly, initials are being used in lieu of their full names.

| Narrative (1) |
|---|

03/20/2021

JHAFERMAN

On 031921, I received blood draw results back from the Colorado Bureau of Investigation Forensic Services for Carley BAKER. The blood results did not show alcohol or drugs of abuse in the screening.

PUBLIC RELEASE

| Officer (2) |
|---|

Reporting Officer:  Haferman, Jason (FC347)

→ Approving Officer:  Heaton, Allen (FC208)

32. Thus, as of March 20, 2021, FCPS as an entity and supervising officers Sergeant Heaton and Corporal Redacted personally, <u>again</u> had notice that Haferman was wrongfully arresting innocent people. This time, not only did they do nothing to stop it; but at least one of them expressly approved of the behavior.

33. It should also be noted that by FCPS's own admission in response to a media inquiry about Haferman's DUI arrests a year later (in May 2022), they stated through their press relations officer that they "**always conduct an internal review of any DUI arrest made by one of its officers that has chemical test results come back negative for drugs/alcohol.**"

34. Thus, according to FCPS's own claims, *multiple* superior officers at FCPS would have had to have reviewed Haferman's wrongful DUI arrest of C.B. in March 2021, and therefore seen: the issues with his roadside administration, discrepancies between the video and his report, and his violation of policy and law by muting his BWC through most of the contact, and not only done nothing to intervene, but actually approved of it.

35. Interestingly, however, despite the claims FCPS made to the press purporting to be supervising and reviewing Haferman's negative blood test DUI arrests during this time, the Axon Evidence Audit Trail for Haferman's BWC video from the C.B. arrest **reveals that no one at FCPS *ever* looked at Haferman's video until more than a year later** (on May 29, 2022) when FCPS was already under fire and public scrutiny for having permitted Haferman to make so many wrongful DUI arrests for so long without any supervision or intervention.

36. In any event, no remedial action, discipline, or any other form of verbal counseling was given to Haferman by FCPS supervisory personnel regarding the wrongful arrest of C.B. And so, he carried on.

37. On February 18, 2021, Officer Haferman made his next wrongful DUI arrest, this time of the disabled veteran Harley Padilla. At the time Haferman stopped Mr. Padilla, Mr. Padilla required a wheelchair to safely walk and had to speak through a tracheotomy tube in his throat. Mr. Padilla had just recently survived a terrible motorcycle accident. It is extremely difficult to watch the video of Haferman's mistreatment of Mr. Padilla. In addition to insulting and denigrating Mr. Padilla both during the stop and throughout the arrest report he wrote about him later, Haferman also made an extraordinary number of false claims about Mr. Padilla in his report that were observably contradicted by his BWC video. For example:

   a. Haferman claimed that Mr. Padilla weaved once over the center line to a significant degree. Haferman's video revealed this to be false. A Larimer County Judge later ruled that this claim was observably false.

   b. Haferman claimed that Mr. Padilla was "slow to react" and didn't respond to the overhead red and blue lights "as a sober person would." Haferman's video revealed this to be false. A Larimer County Judge later ruled that this claim was observably false.

   c. Haferman claimed that Mr. Padilla's verbal responses were slurred and nonsensical, and indicative of impairment. Haferman's video revealed this to be false. A Larimer County Judge later ruled that this claim was observably false. Also - Mr. Padilla *did not have a larynx* and it is worth reiterating that he had to speak *through a trach tube hole in his throat*. Even *this* reality did not make Haferman think twice about making his absurd typical false claims in his DUI arrest report of Mr. Padilla regarding "slurred speech" and "slow responses."

   d. Haferman claimed that Mr. Padilla was "rambling on" about "nonsensical" things and requesting an ambulance without explaining what injury or ailment he had. The video revealed none of this to be true. Mr. Padilla was coherent and responded appropriately to all questions. Mr. Padilla's request for an ambulance was made in response to Haferman repeatedly ordering Mr. Padilla to get out of his car after Mr. Padilla had already told him he needed a wheelchair first to do so.

   e. Mr. Padilla told Haferman several times he was missing a hip and would need a wheelchair to ambulate outside of his vehicle. Haferman can be heard on video telling Mr. Padilla that he "don't have a wheelchair on demand" and that Mr. Padilla should just get out and let Haferman assist him.

   f. Haferman is then heard on video trying to get the utterly disabled Mr. Padilla to agree to participate in literal physical roadside maneuvers. Mr. Padilla, incredulous, said "no" and then repeated that he required a wheelchair to ambulate outside of his car. Haferman left all of this out of his arrest report of Mr. Padilla. Mr. Padilla requested a wheelchair more than 7 times in the first 15 minutes of the stop. Yet there is literally no reference to Mr. Padilla's requests for a wheelchair anywhere in Haferman's report.

   g. Haferman also claimed (like he always did in his DUI arrest reports) that Mr. Padilla had "glassy" and "droopy" eyes. The video revealed this to be a deliberately false

mischaracterization of Mr. Padilla's existing physical deformities as instead being claimed impairment indicators. The video shows that Mr. Padilla's body, face, and parts of his eyelids were covered in burn scars. Observable burn scars on one's eyelids would naturally cause one's eyes to appear "glassy" or "droopy" at all times, and thus would also make the idea of listing these permanent physical features as instead indicators of impairment supporting a DUI arrest entirely ludicrous.

h. Haferman informed Mr. Padilla he could smell marijuana and Mr. Padilla explained that he had a medical card for use of medical marijuana to treat pain from the catastrophic injuries he sustained to his body in a motorcycling accident. Haferman, knowing that anyone who uses marijuana on any regular basis will always have some trace amount of THC in their blood, happily arrested Mr. Padilla despite the absence of any impairment indicators.

i. Mr. Padilla requested that Haferman call an ambulance. Haferman asked him why. Mr. Padilla said because Haferman was harassing him, ordering him to get out of his car which was dangerous, and that he wanted to just go get a blood test now to prove his innocence and knew he could not be safely transported to the hospital in the back of Haferman's patrol car. Haferman included none of this in his report and instead wrote that Mr. Padilla kept asking for an ambulance "but was unable to explain what injury or ailment he had."

j. Finally, after some supervising officers showed up[4] and Haferman proceeded to insult and humiliate Mr. Padilla in front of them some more, an ambulance arrived to transport Mr. Padilla to the hospital for a blood test. Then Haferman took Mr. Padilla to jail. Because Mr. Padilla had several DUIs from over ten years prior, the DUI that Haferman charged him with was a felony.

k. Mr. Padilla could not afford to post the bond set on this class 4 felony DUI. As a result, and because he was unwilling to plead guilty to an offense he knew he had not committed, he sat in jail awaiting trial for over a year.

l. Mr. Padilla's blood test came back on April 21, 2021, showing trace amounts of THC presumed to be unimpairing under Colorado law. At the time those results came back, it also was (and remains) well known and accepted in all scientific communities that there is no correlation between such trace amounts of THC and impairment in any medical marijuana user.

m. Finally, on March 3, 2022, Mr. Padilla's case was heard by a judge in a bench trial. The state presented as expert witness a forensic toxicologist from CBI who testified that Mr. Padilla's blood results offered nothing to support the claim that he was impaired:

---

[4] If Corporal Redacted or Sergeant Heaton were in this group of officers, this constitutes even more specific notice to them regarding Haferman's ongoing disregard for the rights of citizens.

```
BY MR. KRENNING:

     Q    Your numbers from your report which was admitted show

that the blood you tested contained 3.0 nanograms per milliliter

of THC, correct?

     A    That's correct.

     Q    And your testimony that you just provided is that that

in and of itself means nothing with regard to whether or not an

individual was impaired or not, correct?

     A    That's correct.

     Q    And your report further indicates that there are

3.7 nanograms per milliliter of blood of what's abbreviated as

THC-OH, correct?

     A    That's correct.

     Q    And, Agent, that too means nothing with regard to

whether or not the individual who was tested was impaired or not

impaired?

     A    That's correct.

          MR. KRENNING:  I don't have any other questions.
```

n. Larimer County District Court Judge Cure acquitted Mr. Padilla of DUI, DWAI, and Careless Driving. In doing so, the Court further ruled that "based on the totality of the circumstances and the evidence presented, the Court finds that Officer Haferman lacks credibility." The Court ruled that "his testimony was inconsistent" and "changed course on several of the key facts." The Court further ruled that "[s]ome of [Haferman's] testimony is not supported by the evidence," while "some of it was contrary to the evidence." The Court also made the finding that "Officer Haferman's testimony exaggerated the bad driving in this case, not only with his testimony today, but as found on the point of view [video] on February 18 of 2021, when relaying that [information about driving] to dispatch."

o. Even the most cursory review of the claims and descriptions of impairment indications in Haferman's report, when compared to his BWC video, reveals the Larimer County District Court Judge's findings to be true.

p. In other words, if any supervisor at all at FCPS had ever bothered to supervise Haferman, or to otherwise even simply review Haferman's video after Mr. Padilla's blood results came back on April 21, 2021 showing no evidence of impairment, they would have seen that yet again Haferman was lying and exaggerating in his reports about impairment indicators in order to continue his reign as the department's most prolific DUI officer, by repeatedly wrongfully arresting

observably innocent people and charging them with DUI/DWAI offenses they did not commit.

38. Of course, no one at FCPS was supervising Haferman or reviewing his videos.

39. The reality stated in the paragraph above continued *despite* the fact that the DUI arrest numbers Haferman was putting up just 6 months into his post-pandemic-lockdown term as DUI Officer (in the November 2020 – May 2021 timeframe) were significantly higher than any other DUI officer to precede him in the history of the department.

40. The sheer *quantity* of DUI arrests being made by Haferman by this point (over 100), in addition to the negative blood test results now repeatedly coming back on those arrests, should have alerted any reasonable supervising officer of the need to check Haferman's work and ensure he was not violating the constitutional rights of innocent citizens like Plaintiff.

41. If any reasonable supervising officer *had* looked at any of the videos from Haferman's DUI arrests involving negative or near-negative blood test results at this time, they would have seen exactly what the Larimer County District Court Judge saw in the Larkin and Padilla cases, and which of course was also something that any lay person could have easily seen after spending just 10 minutes comparing Haferman's arrest reports with his BWC videos: That is, that:

   a. Officer Haferman was regularly arresting and charging with DUI individuals who appeared quite observably *un*impaired on video and that he was systematically lying and exaggerating in his arrest reports regarding evidence of impairment for those cases; and

   b. Officer Haferman was not administering the SFSTs as trained and was claiming all kinds of normal features of normal human behavior to constitute scientifically validated clues of impairment; and

   c. That Haferman was also regularly targeting and exploiting drivers with disabilities, claiming that all the symptoms of their known medical conditions were instead proof of alcohol/drug impairment.

42. But, because no one was actually supervising Haferman, and because his supervisors were instead approving and lauding his DUI arrest numbers despite the increasing number of blood test results coming back in his cases proving that he had in fact also been arresting innocent people, Haferman happily continued with the unconstitutional conduct and – in the latter half of 2021, really even picked it up a notch.

43. On May 15, 2021, Officer Haferman made another wrongful DUI arrest, this time of G.C. He again included the same false statements and exaggerations of impairment indicators in his report for G.C. He again failed to administer the roadside tests to G.C. in the standardized manner he was trained. He again claimed all the clues of HGN present when they were not, and he again administered the HGN test incorrectly. He also made G.C. go through all the roadside tests despite her being 65 years old and having several

medical conditions contraindicating their use. There were again multiple discrepancies between his BWC videos and what he claimed occurred in his report.

    a.  Haferman arrested G.C. and she did a breath test at the police station, which produced a result of .035% BAC, well under the limit for DUI or DWAI, and, by Colorado law, presumed to be an unimpairing BAC.

    b.  Haferman charged G.C. with DWAI and Careless Driving anyway.

    c.  The district attorney promptly dismissed the DWAI charge. However, due to the Careless Driving charge, the wrongfully charged DWAI was unable to be sealed from G.C.'s record.

    d.  FCPS officer Jason Bogosian (possibly Corporal Redacted) claimed to have reviewed this arrest and approved of it.

    e.  No remedial action, discipline, or any other form of verbal counseling was given to Haferman by FCPS supervisory personnel regarding the wrongful arrest of G.C.

44. On June 10, 2021, Officer Haferman made his next wrongful DUI arrest, this time of R.B. When he stopped R.B., R.B. was clearly having a mental health episode and in need of medical attention. He told Haferman this, many times. Yet Haferman did not get R.B. medical attention. Instead, he listed all of R.B.'s mental health behaviors as indications of impairment, and then arrested him for DUI.

    a.  On August 29, 2021, Haferman received R.B.'s blood results. They were negative for alcohol and all impairing drugs.

    b.  Haferman's supervising officer Defendant Sergeant Heaton (and possibly Corporal Redacted) again claimed to have approved of Haferman's report and arrest.

    c.  The district attorney promptly dismissed the DUI charge against R.B.

    d.  No remedial action, discipline, or any other form of verbal counseling was given to Haferman by FCPS supervisory personnel regarding the wrongful arrest of R.B.

45. On June 11, 2021, Officer Haferman made another wrongful DUI arrest, this time of Cody Erbacher. Mr. Erbacher admitted to having had one beer several hours earlier in the day, however, and to Haferman, any admission to any drinking at any prior time become sufficient grounds in his mind – despite the absence of any actual indications of impairment – to make a DUI arrest. He again included the false statements and exaggerations of impairment indicators in his report for Mr. Erbacher. He again failed to administer the roadside tests in the standardized manner he was trained. He lied about Mr. Erbacher showing clues/signs of impairment when there were none. There were again multiple additional discrepancies between BWC videos and what Haferman claimed occurred in his report.

    a.  On November 10, 2021, Haferman received Mr. Erbacher's blood results. They were negative for alcohol and all drugs.

b. It appears from the reports in Mr. Erbacher's case that Haferman now no longer even had a supervising or approving officer pretending to review his arrests.

c. Despite FCPS claiming that all negative blood test results received by their agency were subjected to an "internal review," the documents in Mr. Erbacher's case indicate that absolutely no one at FCPS, internal or otherwise, was reviewing or claiming to review anything in this Haferman wrongful arrest with "none detected" results nor in any other Haferman wrongful arrest.

d. Upon receipt of the blood results, the district attorney promptly dismissed the DUI charge against Mr. Erbacher.

e. Until Haferman's pattern of constitutional violations was brought to the attention of the local and national news media in April 2022, absolutely no remedial action, discipline, or any other form of verbal counseling was ever given to Haferman by FCPS supervisory personnel regarding the wrongful arrest of Mr. Erbacher.

46. On July 23, 2021, Officer Haferman made another wrongful DUI arrest, this time of Carl Sever. Mr. Sever was 74 years old at the time Haferman arrested him. He was driving home from the gym. Haferman claimed to pull him over because Mr. Sever was "going 10 mph under the speed limit." Going 10 mph under the speed limit is not unlawful.

a. Haferman falsely claimed in his report that there was an odor of alcohol coming from Mr. Sever's vehicle and from "his breath." Mr. Sever had not drank alcohol in more than 10 years. He told Haferman this.

b. Haferman again made false claims in his report (controverted by the BWC video) that Mr. Sever had "slow speech" and nonsensical claims that his "body behavior was slow." It is difficult to imagine what speed of movement Haferman was expecting out of this, or any other, 74-year-old, in order to not be declared drunk.

c. With Mr. Sever, Haferman *again* muted his BWC when a cover officer arrived and kept it muted for the rest of his roadside test administration with Mr. Sever.

d. Haferman again failed to administer the roadside tests in the standardized manner he was trained. Haferman again counted as clues of "impairment" against Mr. Sever various features of normal human behavior that were not, by any training or manual, actual clues of impairment.

e. Mr. Sever advised Haferman that he had a TBI from a car accident. Haferman deliberately omitted this from his report.

f. Haferman arrested Mr. Sever for DUI and took him for a blood draw. Then he took Mr. Sever to jail. When Mr. Sever was released the next day, he did not have his phone, wallet, or car, and did not know the number for anyone he could call to pick him up. As a result, he had to walk 4.5 miles home.

g. More than 3 months later, on November 9, 2021, Mr. Sever's blood test results came back. They were negative for alcohol and impairing drugs. There was merely some trace THC (1.4 ng) at a level presumed by Colorado law to be unimpairing and a trace amount of Mr. Sever's anti-seizure medication which he had been prescribed for over 15 years.

h. The Larimer DA's Office dismissed the charges against Mr. Sever.

47. On July 29, 2021, Haferman made another wrongful DUI arrest, this time of Jesse Cunningham. Mr. Cunningham is a disabled veteran and the Vice President of a veteran nonprofit organization in Nebraska dedicated to helping veterans reintegrate into their communities after leaving the military and fighting to prevent veteran suicide. He had come to Colorado for the week with his wife and two daughters on family vacation. His day had started off tragically – receiving the news that a close family friend of his had died. Not wanting to ruin the whitewater rafting trip the family had planned together for the rest of the day, he tried to put it out of his mind and went along. After the rafting trip, he attempted to get money out of a nearby ATM to tip the rafting instructor. The ATM claimed to be dispensing money but nothing came out. This left Mr. Cunningham and his family with no choice but to wait around for nearly two hours waiting for the ATM operator to refund the cash the machine had deducted. While waiting, he had two 3.2% alcohol (PBR) beers. After the ATM owner arrived and fixed the mistake, he and his family went to McDonald's to get some food before making the drive back to where they were staying in Estes Park. After eating, at 8:15 pm, they started their drive there. Just minutes in, at 8:18 pm, they witnessed a horrific motorcycle accident caused by a Mazda RX-7 driver pulling out in front of 3 motorcyclists at an intersection, causing them all to crash. One of the motorcyclists impacted the Mazda and went cartwheeling through the air and landing in critical condition in a ditch.

a. Mr. Cunningham is a combat veteran with 32 months of combat experience and combat lifesaving training. He immediately pulled over, had his wife call 911, and ran to provide aid. The motorcyclist's leg was nearly severed from the knee down and his femur bone was sticking out of his skin by about 8". The rider's femur had been "desleeved" which means that the force of the impact was so great that it had removed all the tissue, tendons, and blood off the bone.

b. Mr. Cunningham, understanding the severity of the rider's injuries and the need for prompt lifesaving measures, immediately began stabilizing the rider, using the T-shirt of a bystander to control the bleeding. As he did this, he assessed the rest of the rider's injuries while also triaging the other two injured motorcyclists.

c. The scene was utterly chaotic with multiple injured riders in need of help and dozens of bystanders getting out of their cars to come and watch or ask to assist. While he worked to stem the bleeding from the rider's desleeved femur, Mr. Cunningham also managed to take control of the scene, quickly giving directions to people on where to go, who to call, and what to do to assist him.

d. When paramedics finally arrived on scene, Mr. Cunningham filled them in on the list of all injuries he had triaged and brought them up to speed on the life- and leg-

saving measures he had taken so far with respect to the most injured rider so they could take over.

e. Since Mr. Cunningham and his family were the main witnesses to this accident, FCPS officers asked them to remain on scene and fill out witness statements describing what they saw. They did so. The officers then asked if they would remain on scene to answer any questions that the accident reconstruction officers would have. They were all exhausted, both physically and mentally, Mr. Cunningham in particular. Even still, they all said they would continue to stay there to do whatever was needed to assist.

f. While waiting for the accident reconstruction team to arrive, Mr. Cunningham received a phone call from a friend back home with horrible news. His friend told him that their mutual friend that had died that morning had in fact died by suicide. Mr. Cunningham had dedicated his life to preventing such an event and was completely gutted by this news. It took everything that he had left in him to try and keep it together and not break down in front of his wife and daughters.

g. And then - Officer Haferman arrived.

h. Haferman marched up to Mr. Cunningham. He informed Mr. Cunningham that someone thought they had smelled the odor of alcohol on him earlier.

i. Mr. Cunningham is former military police. He worked for Homeland Security. He grew up and lived surrounded by friends and family all in law enforcement. As a result, at the foundation of his soul was nothing but complete trust and respect for all those in law enforcement and a core belief that others in his field, like him, held values like integrity and fairness in their work most dear.

j. For this reason, Mr. Cunningham heard this allegation of alcohol odor from Haferman and truly thought nothing of it. Without hesitation or worry, he explained to Haferman how he had had two light beers nearly four hours ago, so if someone had in fact smelled it, that would be the cause.

k. Throughout this encounter, Mr. Cunningham can be seen on video appearing completely sober, unimpaired, coherent, and normal. Ignoring this presentation and ignoring all that Mr. Cunningham had just done to save the lives of multiple people in a horrific accident, Haferman informed Mr. Cunningham that he needed him to do roadside tests to prove he was safe to drive.

l. Mr. Cunningham explained he was completely exhausted from all the events of that day, both mentally and physically, and asked if he could instead just do a breath test to prove that he was unimpaired.

m. Haferman had a portable breath test on hand and available. But he told Mr. Cunningham no, that the PBT result "wasn't admissible in court," and so instead insisted that he complete the more physical roadside tests. Mr. Cunningham attempted to cooperate, complaining the whole time that his shoes were filled with water and his legs felt like Jell-O.

n.  Mr. Cunningham did not know any of this about Haferman. And so, despite his catastrophic day filled with physical exertion, devastating emotional loss, and extraordinary mental stress, Mr. Cunningham attempted to cooperate with Haferman's balancing tests, complaining the whole time that his shoes were filled with water from rafting (you can hear them squishing on the video) and that his legs felt like Jell-O.

o.  Haferman again did not administer the tests in the standardized manner he was trained and Haferman again included multiple lies in his report regarding Mr. Cunningham's performance on the tests that were obviously contradicted by his BWC video.

p.  It is obvious from the videos that Mr. Cunningham was both totally exhausted and completely sober and unimpaired.

q.  Haferman arrested Mr. Cunningham for DUI anyway. He also charged him with two counts of Child Abuse due to having his daughters with him in the car. Mr. Cunningham was horrified. He again begged Haferman to give him a breath test on scene to prove his innocence. Haferman again refused him a breath test.

r.  Haferman put Mr. Cunningham into handcuffs and told him he would need to complete a chemical test. Mr. Cunningham again implored Haferman to let him do a breath test.

s.  Haferman told Mr. Cunningham he would have to take a blood test because he had admitted earlier that he had a prescription for Adderall for his ADHD. Notable here is the fact that Mr. Cunningham told Haferman that he was *prescribed* this medication, but when asked when he had last taken it, he told Haferman that it had been several days, and that *he didn't even have it with him* because he had left it at home in Nebraska as he didn't need to take his ADHD medication while he was on vacation.

t.  Mr. Cunningham then spent the night in jail. He spent thousands of dollars hiring legal counsel. His family, utterly traumatized, picked him up and they drove home to Nebraska to prepare for the funeral of their close family friend.

u.  Of course, Haferman was not done with Mr. Cunningham yet.

v.  On Tuesday morning, while getting dressed for his friend's funeral in Nebraska, Child Protective Services showed up at Mr. Cunningham's house to interview his children. **Haferman had called in a referral to Nebraska CPS to investigate Mr. Cunningham for child abuse**.

w.  Weeks later, the injured motorcyclist who Mr. Cunningham had worked to save and Mr. Cunningham were able to connect to each other. The motorcyclist (Max) told Mr. Cunningham that it was only thanks to him and the measures he took on scene that his leg was able to be saved rather than having to be amputated.

x.  Months later, on October 20, 2021, Mr. Cunningham's blood results finally came back. "None detected" for alcohol and all impairing drugs.

y.  The Larimer DA dismissed the charges against Mr. Cunningham.

z.  Despite FCPS claiming that all negative blood test results received by their agency were subjected to an "internal review," the documents in Mr. Cunningham's case indicate that absolutely no one at FCPS, internal or otherwise, was reviewing or claiming to review this Haferman wrongful arrest.

aa. Upon information and belief, until Haferman's pattern of constitutional violations was brought to the attention of the public by local and national news media in April 2022, absolutely no one at FCPS ever looked at this or any other wrongful Haferman DUI arrest involving "none detected" blood results.

48. On August 8, 2021, Officer Haferman made another wrongful DUI arrest, this time of B.C. B.C. was another disabled veteran. Haferman came into Krazy Karl's while on duty to pick up food he had ordered. While there, he saw B.C. drink one beer. He decided he would wait for B.C. to leave and arrest him for DUI. Haferman went out to his car and waited.

a.  B.C. wasn't even planning to drive. He had called his mom to pick him up.

b.  As soon as his mom told him she was nearby, B.C. went to move his car to a legal parking space to be left overnight. He drove his car about 10 feet. Haferman immediately activated his red and blue lights and ordered B.C. out of the car.

c.  Haferman later claimed in his report from this arrest that he activated his BWC during the encounter, but the video "got lost in Evidence.com" and could not be recovered.

d.  Haferman falsely claimed in his report that numerous admissions were made by B.C. during the periods in which he "lost" his BWC video.

e.  Some of the roadside tests Haferman did with B.C. were recorded by his cover officer's (Young's) BWC video. Comparing that video to Haferman's report again reveals multiple lies, exaggerations, and discrepancies between what actually occurred and what Haferman put in his report. The video also, again, shows Haferman not administering the tests to B.C. correctly.

f.  For example, B.C. did the one-leg stand maneuver perfectly and for ten seconds longer than anyone is supposed to be able to do it. Despite this, Haferman claimed in his report that B.C. failed it.

g.  While arresting B.C., B.C.'s mother arrived on scene within minutes and corroborated the fact that she was picking B.C. up. Haferman arrested B.C. for DUI anyway.

h.  B.C. requested a breath test. His breath test results were .04 BAC which is under the limit for both DUI and DWAI, and by Colorado law, *presumed* to be an unimpairing amount of alcohol.

i.  Haferman charged B.C. anyway and booked him into the jail. Then he went to write his report in which he claimed B.C. made all kinds of admissions and exhibited all kinds of signs of impairment indicators. He then, as mentioned previously, conveniently, and once again, claimed that his BWC footage of the incident mysteriously had disappeared.

j.  The district attorney's office completely dismissed the case against B.C.

k.  According to FCPS's reports and records for B.C.'s case, again, no supervising officer ever reviewed or looked at Haferman's wrongful arrest of B.C. (nor his mysterious repeated loss of BWC video footage).

l.  Upon information and belief, prior to the media attention on Haferman's wrongful arrests in April 2022, no remedial action, discipline, or any other form of verbal counseling was ever given to Haferman by FCPS supervisory personnel regarding the wrongful arrest of B.C. or Haferman's (now) repetitive destruction of his BWC videos.

49. On September 4, 2021, Officer Haferman made another wrongful DUI arrest, this time of K.S. K.S. swerved to avoid a deer in the road and hit a tree. Haferman ignored this very normal explanation for the car leaving the road and decided to instead use it to arrest her for DUI. He again included the false statements and exaggerations of impairment indicators in his report for K.S. He failed to administer the roadside tests to K.S. in the standardized manner he was trained. He lied about K.S. showing clues or signs of impairment. There were multiple additional discrepancies between BWC videos and what he claimed occurred in his report.

a.  On December 15, 2021, Haferman received K.S.'s blood results. They were negative for alcohol and all drugs.

b.  It appears from the reports in K.S.'s case that by this time, Haferman continued to have no supervising or approving officer reviewing his work.

c.  Despite FCPS claiming that all negative blood test results received by their agency were subjected to an "internal review," the documents in K.S.'s case indicate that absolutely no one at FCPS, internal or otherwise, was reviewing this Haferman wrongful arrest of K.S., or any other Haferman wrongful arrest.

d.  Upon receipt of the blood results, the district attorney promptly dismissed the DUI charge against K.S.

e.  Upon information and belief, until Haferman's pattern of constitutional violations was brought to the attention of the public by local and national news media in April 2022, absolutely no one at FCPS ever looked at this or any other wrongful Haferman DUI arrest involving "none detected" blood results.

f.  Upon information and belief, prior to the media attention on Haferman's wrongful arrests in April 2022, no remedial action, discipline, or any other form of verbal counseling was ever given to Haferman by FCPS supervisory personnel regarding the wrongful arrest of K.S.

50. On October 8, 2021, Officer Haferman made another wrongful DUI arrest, this time of D.A. He again included the same false statements and exaggerations of impairment indicators in his report for D.A. He failed to administer the roadside tests to D.A. in the standardized manner he was trained. There were multiple discrepancies between his BWC videos and what he claimed occurred in his report.

a.  After getting his blood, Haferman booked D.A. into the jail. Upon D.A.'s release, he was subjected to mandatory bond conditions which required him to submit to sobriety monitoring and drug/alcohol testing for over 3 months.

b.  On January 10, 2022, Haferman received D.A.'s blood results which showed a result of .036% BAC, well under the limit for DUI or DWAI, and, by Colorado law, presumed to be unimpairing.

c.  It appears from the reports in D.A.'s case that by this time, Haferman continued to have no supervising or approving officer reviewing his work.

d.  Another officer who was on scene (Kevin Alexander) to witness Haferman administer roadsides to D.A., aware of Haferman's failure to administer them correctly and propensity for reporting impairment indicators in sober people that would later be absent from any BWC video, actually went out of his way to state in his own report that while on scene with Haferman he did not at any time "take note of [D.A.]'s performance" on the roadsides. Officer Alexander did not corroborate any of the claimed impairment indicators that Haferman alleged in his report.

e.  Upon receiving D.A.'s blood results, the Larimer County district attorney once again promptly dismissed the wrongful DUI arrest Haferman had filed against D.A.

f.  No remedial action, discipline, or any other form of verbal counseling was given to Haferman by FCPS supervisory personnel regarding the wrongful arrest of D.A.

51. Again on October 8, 2021 (yes, he had **two in one day**), Haferman made his next wrongful DUI arrest, this time of G.E. G.E. was visiting Colorado from Idaho and driving a rental car. Haferman pulled him over for the headlights not being fully activated. He learned as soon as he pulled him over that this was because it was a rental car that G.E. was not familiar with. Undeterred, Haferman ordered G.E. out of the car to perform roadside tests.

a.  He again included the false statements and exaggerations of impairment indicators in his report for G.E. He failed to administer the roadside tests to G.E. in the standardized manner he was trained. He lied about G.E. showing clues/signs of impairment that were not present. There were multiple additional discrepancies between BWC videos and what he claimed occurred in his report.

b. Despite performing the HGN test on G.E. incorrectly, it was still obvious from Haferman's BWC that G.E. had zero clues on the HGN. Haferman lied and claimed G.E. had all 6 clues of impairment on the HGN test in his report.

c. Haferman then arrested G.E. for DUI and took him to the jail for a breath test. G.E. blew a .016% on the breath test, which is scored as a "none detected" result on the machine due to its range of error. G.E. was, thus, provably observed to be innocent to Haferman that very night.

d. So did Haferman apologize and let G.E. go? Of course not. He charged him with DWAI and booked him into the jail.

e. It appears from the reports in G.E.'s case that Haferman continued to no longer have any supervising or approving officer pretending to review his arrests.

f. Because of the lies and exaggerations Haferman included in his report about G.E., it still took more than two months for the District Attorney to dismiss the DWAI charge he had filed against him.

g. Upon information and belief, until Haferman's pattern of constitutional violations was brought to the attention of the local and national news media in April 2022, absolutely no one at FCPS ever looked at this or any other wrongful Haferman DUI arrest involving negative chemical test results.

52. On November 19, 2021, Officer Haferman made another wrongful DUI arrest, this time of S.J. He again included the false statements and exaggerations of impairment indicators in his report for S.J. He failed to administer the roadside tests to S.J. in the standardized manner he was trained. He lied about S.J. showing clues or signs of impairment when there were none. There were multiple additional discrepancies between BWC videos and what he claimed occurred in his report.

a. S.J. denied alcohol consumption and blew triple zeroes into a PBT on scene showing negative for alcohol. Haferman arrested her for DUI and forced a blood draw anyway.

b. On February 23, 2022, Haferman received S.J.'s blood results. They were negative for alcohol and all drugs.

c. It appears from the reports in S.J.'s case that by this time, Haferman continued to have no supervising or approving officer reviewing his work.

d. Despite FCPS claiming that all negative blood test results received by their agency were subjected to an "internal review," the documents in S.J.'s case indicate that absolutely no one at FCPS, internal or otherwise, was reviewing this Haferman wrongful arrest of S.J. or any other Haferman wrongful arrest.

e. Upon receipt of the blood results, the district attorney promptly dismissed the DUI charge against S.J.

    f.   Until Haferman's pattern of constitutional violations was brought to the attention of the local and national news media in April 2022, absolutely no remedial action, discipline, or any other form of verbal counseling was ever given to Haferman by FCPS supervisory personnel regarding the wrongful arrest of S.J.

53. On December 3, 2021, Officer Haferman made another wrongful DUI arrest, this time of Plaintiff Harris Elias.  Mr. Elias is also suing the Defendants in this case. The facts of his case are set forth in the case of *Elias v. City of Fort Collins, et al.*, Larimer County District Court case number 2023CV30350.

    a.   Mr. Elias was observably unimpaired and clearly sober.

    b.   Because Mr. Elias refused to do roadsides or be interrogated by Haferman, however, Haferman arrested him for DUI and Child Abuse.

    c.   Haferman also slammed Mr. Elias's knee into the jamb of his patrol car door, requiring medical treatment.

    d.   On March 4, 2022, after having tested Mr. Elias's blood for every drug under the sun and found nothing, CBI sent Mr. Elias's official blood test results to Haferman and FCPS, indicating that nothing at all was detected.

    e.   The DA's office dismissed all the charges against Mr. Elias.

    f.   Still, no one at FCPS did anything to stop Haferman. No one at FCPS cared. And so Haferman carried on.

54. On December 19, 2021, Haferman made yet another wrongful DUI arrest, this time of L.M. Haferman claimed that L.M. stopped at an intersection for longer than he thought should be normal. He also claimed she failed to signal when turning. He did not record any of these claimed driving behaviors. He ordered L.M. out of her car and began his DUI fishing expedition. It did not go well. L.M. appeared normal and unimpaired. She told him that she had had 2 glasses of wine hours earlier and was now completely sober. He arrested her anyway.

    a.   L.M. requested a breath test. Her breath test results were under the limit for both DUI and DWAI, and by Colorado law, *presumed* to not be impairing.

    b.   Haferman arrested and charged L.M. anyway and booked her into the jail. Then he went to write his report in which he claimed L.M. made all kinds of admissions and exhibited all kinds of signs of impairment indicators during the roadsides. He then, conveniently, and once again, claimed that most of these indicators would not be observable on his BWC footage because the audio had yet again mysteriously "malfunctioned."

    c.   The district attorney's office dismissed the DUI charge against L.M.

    d.   According to FCPS's reports and records for L.M.'s case, again, no supervising officer ever reviewed or looked at Haferman's wrongful arrest of L.M. (nor his

mysterious repeated propensity for lost, damaged, or malfunctioning BWC footage).

e.  No remedial action, discipline, or any other form of verbal counseling was ever given to Haferman by FCPS supervisory personnel regarding the wrongful arrest of L.M. or Haferman's repetitive tampering/destroying of his BWC content.

55. On March 26, 2022, Officer Haferman made another wrongful DUI arrest, this time of Carly Zimmerman. Haferman stopped Ms. Zimmerman because he felt she went too quickly past him while he was on another traffic stop. She had been crying for three hours and told him so. He ignored this and instead pressed her to admit to drinking alcohol. She told him she had not. He arrested her for DUI and demanded a chemical test. She agreed to a blood test. Haferman then inexplicably muted his BWC for the rest of the encounter with Ms. Zimmerman.

a.  Haferman likely realized it was extremely probable that Ms. Zimmerman's blood would reveal that he had made another wrongful DUI arrest. He elected to remedy this problem by muting his BWC and then later falsely claiming under oath that Ms. Zimmerman had during the 30 minutes spent at the hospital refused to complete the blood test.

b.  Police practices experts later reviewed the BWC from Haferman's arrest of Ms. Zimmerman (see *infra*) and voiced shock and condemnation that he had arrested someone who presented as she did, with zero indications of drug or alcohol impairment whatsoever.

c.  Haferman falsely claimed in his report for Ms. Zimmerman's arrest that she was slurring her speech. The portion of the BWC that did have audio (the first 17 minutes) revealed this to be a categorical lie.

d.  Haferman falsely claimed in his report for Ms. Zimmerman's arrest that she failed various roadside maneuvers. The BWC revealed this to also be a categorical lie.

e.  The DA's office later dismissed the criminal case against Ms. Zimmerman.

56. Thus, prior to encountering Plaintiff Mr. Groves in April 2021, **Haferman had personally effected at least 17 wrongful DUI arrests of innocent people in less than a year** without intervention, comment, or reprimand from anyone at FCPS.

57. Upon information and belief, the only feedback Haferman had received from FCPS supervisory personnel (including Sergeant Heaton and Corporal Redacted) about his DUI arrests by this time was positive and blind reinforcement to continue whatever he was doing, as it was producing DUI arrest statistics that FCPS benefitted from greatly in the eyes of the public when posted about on social media, seeking additional agency funding, and when shared with MADD.

58. Upon information and belief, no one at FCPS knew about the inordinately high number of innocent people Haferman was arresting because no one was supervising him or reviewing his work. In the alternative, if anyone at FCPS *was* aware of all the innocent

people Haferman was arresting, they simply didn't care and so did nothing to try and prevent Haferman from doing it again.

59. It was therefore by April 2022 not just reasonably foreseeable from Haferman's pattern of misconduct but in fact utterly inevitable that he would violate the constitutional rights of more citizens in the very near future with more wrongful DUI arrests.

**HAFERMAN'S WRONGFUL ARREST OF PLAINTIFF DERRICK GROVES**

60. And indeed, he did. On April 7, 2022, just a few weeks after he and FCPS had received Harris Elias's "none detected" blood results, and over a month after a Larimer County judge had found Haferman to be literally not credible as a witness in court, Officer Haferman – clearly unencumbered by worry of any consequence to him for his now very regular misconduct – made yet another wrongful DUI arrest, this time of Plaintiff Derrick Groves.

61. Mr. Groves had been driving from a friend's house to his girlfriend's. He was driving a Tesla Model Y that had beta Autosteer. This is a Tesla product that essentially controlled steering for the driver.

62. Mr. Groves's phone rang and he picked it up to look at who was calling. As he did so, the Autosteer overcorrected and sent Mr. Groves's Tesla over an embankment.

63. The damage was not catastrophic but Mr. Groves nevertheless ensured police were called and stayed on scene to cooperate with their investigation and writing a report.

64. FCPS officers arrived. One of them was Officer Haferman.

65. Haferman began questioning Mr. Groves. He learned that Mr. Groves was currently on probation. Haferman decided this was sufficient basis to make Mr. Groves his next victim.

66. Haferman asked Mr. Groves to complete roadside tests to prove his sobriety. Mr. Groves knew he was unimpaired and so was happy to do so. He reminded Haferman that he had just been in an accident and was a bit banged up, and so warned him that he was probably not going to be great at walking a line.

67. Haferman administered the HGN test to Mr. Groves and administered it, as usual, incorrectly. Haferman recorded "clues" of impairment in Mr. Grove's eyes that were not present and also claimed impairment indicators like "pupils of different sizes" which were not even clues of impairment he had training or knowledge to opine on.

68. Throughout this encounter, Mr. Groves's walk was normal and without indication of impairment, Mr. Groves's speech was normal and without indication of impairment, and Mr. Groves's standing was normal and without indication of impairment.

69. Haferman and his FCPS cover officers then set out to interviewing the bystanders on scene to see if they could help give him something to use to justify his inevitable arrest of Mr. Groves for thus far nonexistent impairment. They had no luck there. Both witnesses on scene told the officers that Groves seemed fine to them, had no odor of alcohol, and had not during their extended time with him acted strangely or intoxicated.

70. Haferman was undeterred. He went back to Mr. Groves and interrogated him more, desperate for some kind of admission.

71. It should be noted that Haferman never – at *any* time during his encounter or arrest of Mr. Groves – advised Mr. Groves of his *Miranda* rights.

72. Mr. Groves had a medical card for medical marijuana use. He informed Haferman of this but made very clear that despite the card, he still had not used marijuana for several days. He affirmed, confirmed, and reaffirmed – repeatedly – to Haferman that he had not consumed any alcohol, any drugs, or any marijuana anytime recently and was very, very sober.

73. In fact, no less than 6 times, Mr. Groves told Officer Haferman in very clear terms that he had nothing whatsoever in his system.

74. The BWC videos showing Mr. Groves throughout this encounter with Haferman corroborate what Mr. Groves was saying about his sobriety to have been plainly true.

75. Obvious driver innocence hadn't stopped Haferman before, and it certainly wasn't going to stop Haferman today. He arrested Mr. Groves for DUI and put him in cuffs.

76. Haferman told Mr. Groves that because he suspected him of "being on drugs," he would have to submit to a blood test. Mr. Groves complied with the blood test.

77. On the way to the hospital, at the hospital, on the way to the jail from the hospital, Mr. Groves told Officer Haferman again and again: "You're wrong. You're just wrong." Haferman ignored him.

78. Haferman took Mr. Groves to jail.

79. Haferman then set to giving Mr. Groves the full Haferman-wrongful-DUI-arrest treatment in his arrest report. Haferman alleged Mr. Groves had "bloodshot, glassy eyes, and his pupils appeared to be different sizes," none of which was true. He claimed that Groves's eyes "did not complete [the] HGN test as a sober person," which was not true. Haferman also, as per usual, again administered the HGN incorrectly.

80. Haferman omitted from his report all of Mr. Groves's comments regarding his innocence and all of the evidence related to his speech, balance, movements, walking, and comprehension that universally indicated he was sober and unimpaired.

81. Mr. Groves spent the night in jail. He wasn't just sober – he was now devastated, terrified, and in shock. He was not released until the following evening.

82. Mr. Groves life was completely upended and devastated by Haferman's wrongful arrest.

83. Haferman reported the new criminal case to the Larimer County Probation Office.

84. Probation also increased the frequency of Mr. Groves's monitored sobriety testing in response to Haferman's allegation of him having committed DUI.

85. Mr. Groves, waiting for months upon months for the blood results that would vindicate him, grew despondent. He began having panic attacks whenever he saw law enforcement or even when he was merely anticipating running into members of law enforcement.

86. He lost work and was passed over for a job opportunity he had been interviewing for at the time of his arrest. He struggled to concentrate.

87. Mr. Groves had to turn to family for help hiring a defense attorney. But he struggled to convince his family to believe that he had been falsely accused. The fact of Mr. Groves's previous case made him uniquely vulnerable to this type of relational destruction from such a false allegation. As a result, Mr. Groves was forced to witness the people he loved most, and relied upon most for support, including his own father, hesitate to believe him. This was utterly devastating to Mr. Groves.

88. Mr. Groves sought therapy to deal with the depression and all-consuming sense of loss that accumulated during this period. He could not afford anyone. He fell into a dark hole of isolation and hopelessness.

89. The false charges brought by Haferman also impacted Mr. Groves's relationship with his girlfriend. She was on scene and watched him be arrested. Worse, as he arrested Mr. Groves, Haferman paraded him in front of his girlfriend deliberately and told her, "He's under arrest. He's under arrest for Driving Under the Influence. He will be going to jail." Mr. Groves's girlfriend was visibly horrified and began sobbing. Mr. Groves was utterly humiliated.

90. Also while being arrested, Mr. Groves begged his girlfriend to believe that he was innocent as Haferman put him in handcuffs. His girlfriend continued sobbing, unsure of what to believe, and in a state of total shock. Mr. Groves implored her repeatedly to please believe that he was innocent. This scene as captured on the officers' BWC is heart-wrenching to watch.

91. Mr. Groves then also had to ask his girlfriend to pick him up from the jail the following night.

92. Living with this case and the possibility of his probation also being revoked due to the false charges was the lowest, sickest feeling Mr. Groves had ever felt in his life.

93. Mr. Groves had to pay attorneys fees to hire counsel in two cases as a result of this wrongful arrest. He missed work and job opportunities due to the stress from the baseless charges. He lost sleep worrying that Haferman would find a way to tamper with or alter his blood test results. Mr. Groves knew that if Haferman succeeded in doing so, that would be the end of everything that he cared about.

94. Finally, on May 26, 2022, the blood results came back from CBI: Nothing detected. No alcohol, no drugs, no marijuana – no nothing.

95. The DA's office eventually the DUI case against Mr. Groves.

96. Haferman was utterly unaffected by his receipt of proof that Mr. Groves was innocent. This is because he already *knew* Mr. Groves was innocent when he arrested him. No one at FCPS had ever cared about his wrongful DUI arrests before and so he naturally presumed no one at FCPS would care about this one either.

97. Thus, that very same day (5-26-22), Haferman's understanding of his own impunity at FCPS was observed reaching extraordinary heights.

98. Hours after seeing Mr. Groves's blood test results, Haferman testified at the DOR (DMV) hearing regarding the revocation of Ms. Zimmerman's license. The hearing was to determine whether she had refused a blood test that Haferman had destroyed the video evidence of.

   a. At this hearing, Haferman boldly testified that he was not going to answer questions about Ms. Zimmerman's performance on the roadside tests because he couldn't remember it and he didn't believe he had to.

   b. Throughout the DOR hearing, Haferman can be heard literally making his own objections, as the testifying witness, to defense counsel's questions about the roadsides.

   c. Eventually the DOR hearing officer had to instruct Haferman to stop making objections and instead respond to the very relevant questions being asked. Rather than comply, Haferman got confrontational with the hearing officer and demanded that he (yes, the DOR hearing officer presiding over the hearing) supply *him* with legal authority for why he should have to testify about the specifics of the roadside maneuvers.

   d. Haferman then threatened the hearing officer that if he forced him to answer questions about the specific roadside tests, then he would be setting some kind of unlawful precedent going forward.

   e. At this same DOR hearing, Haferman initially testified under oath that the Larimer County District Court Judge did not make findings about his credibility in the Padilla case. When confronted with the transcript showing this had in fact occurred, he then proceeded to declare her finding incorrect, stating that he above all others knew what was true due to his "training and experience."

## THE ACCESSIBLE DATA IS INCOMPLETE

99. In 2021, FCPS (as an entire agency) made 504 DUI arrests. Officer Haferman was involved in 191, or nearly 40%, of them. Notably, FCPS has not released the number of DUI arrest cases where Haferman was the officer that made the arrest decision.

100. Upon information and belief, there are more innocent citizens who have been arrested and wrongfully charged with DUI/DWAI by Officer Haferman. Plaintiff simply cannot

access records to identify those individuals and detail their wrongful arrests here due to Colorado's sealing laws.

    a. Under Colorado law (until 2022), if a defendant's criminal case was dismissed, the defendant could file a petition to seal the case which then causes all records related to it to be destroyed.

    b. As a result, when people are wrongfully charged with DUI and their blood results come back showing they were so wrongfully charged and the DA's office dismisses the case, the vast majority of those people then (desperate to try and reduce the damage inflicted upon their lives by the wrongful arrest) file petitions to seal which results in the destruction of those records at FCPS.

    c. The only wrongful arrest records accessible to Plaintiff's counsel through CORA requests, then, are those individuals whose cases were dismissed and who also did not know that they could seal their case. This is necessarily a small number of people because Larimer County judges as a matter of policy expressly advise defendants whose cases are dismissed that they can seal.

    d. Making the identification of other wrongful DUI arrest victims even *more* difficult, Colorado's sealings law recently changed, and effective January 1, 2022, dismissed criminal cases are now *automatically* sealed.

    e. It is now nearly impossible to obtain through open records requests any of the records related to wrongful arrests. The only remaining avenue to access such materials is through the civil discovery process after filing a civil lawsuit.

101. Even under these difficult-information-gathering conditions, however, Haferman's wrongful DUI arrest activity became sufficiently alarming for the local press to begin asking questions in April 2022 – notably, critically, and quite provably, *well* before any supervisors at FCPS ever began asking any questions.

### MEDIA COVERAGE PROMPTS FCPS TO LIE, SCRAMBLE, AND GAS-LIGHT THE PUBLIC

102. On April 8, 2022, Fox 31 Denver (KDVR) Investigative Reporter Rob Low received a tip about Haferman and began investigating Haferman's pattern of wrongful DUI arrests, starting with that of Mr. Elias. On that day (April 8), Mr. Low sent a records request to FCPS requesting the videos and reports from Mr. Elias's arrest.

103. FCPS's records custodian took 3 weeks to do it, but eventually, FCPS provided reporter Mr. Low with the Elias videos. Business at FCPS and with Haferman's DUI arrest work continued as usual.

104. Months later, when public pressure forced FCPS to terminate Haferman, FCPS made repetitive assertions to the press and in their own reports that they had spontaneously opened an internal investigation into Haferman of their own initiative on April 13 and, they doth protested quite too much, "not in response" to any media inquiries.

105.  However, there exist no records corroborating this fanciful claim beyond FCPS's own self-serving statements that this is the date they began their self-initiated internal investigation.

106.  Notably, if FCPS *had* opened an internal affairs investigation into Haferman on April 13, it certainly didn't involve telling Haferman about it, and it certainly didn't involve telling Haferman to change anything he was doing.

107.  Because on April 15, 2022, Haferman was still working as DUI Officer for FCPS and that very day himself made two more DUI arrests. During one of the arrests, he mentioned to the arrestee that his 2-year-term as DUI Officer was ending soon and he'd be rotating back to patrol. Haferman during this conversation gave no impression whatsoever that he was under investigation for anything or that would otherwise suggest he was being forced to rotate out of the role (and, the end of April 2022 would have in fact marked Haferman having served the full 2 years of every FCPS DUI Officer's 2-year term, as scheduled).

108.  And whatever claimed "internal investigation" FCPS was doing also didn't affect Haferman on May 14, 2022, when he <u>again</u> wrongfully arrested someone for DUI, this time 75-year-old Chuck Matta, despite no indications of impairment. After being put into handcuffs and taken to jail, Mr. Matta requested (repeatedly) that he be allowed to do a breath test. Haferman finally relented at the station, where Mr. Matta blew triple zeroes.

109.  The day that FCPS finally released Mr. Elias's videos to reporter Low, on April 29, 2022, they also apparently sent Defendant Sergeant Heaton a heads up about it, probably because he was the supervising sergeant involved on scene and also had elected not to create a BWC video of his involvement (or the formal complaints made to him by Mr. Elias) in violation of Colorado law and FCPS policy.

110.  Defendant Heaton decided it might be a good time to watch what was recorded in the other officers' BWC videos regarding his involvement. He knew he (deliberately) hadn't recorded anything of Mr. Elias's case himself but worried if the other officers present there with him had made sure to at least mute their mics to ensure his comments and approval of Haferman's actions weren't recorded. So, for the first time, on April 29, 2022, Sergeant Heaton watched Haferman's video from the Elias arrest.

   a.  This entire sequence of events (a citizen witnessing police officer misconduct, requesting their supervising sergeant to make a complaint, the sergeant responding and "taking the complaint" and then eradicating evidence, video or otherwise, of said complaint) is eerily and grotesquely similar to that of (now former) Sergeant Metzler's infamous conduct in the case of *Karen Garner v. City of Loveland, et al*. When Metzler's misconduct was exposed to the public by Ms. Garner's counsel, Metzler lost his job for it.

   b.  FCPS is aware of Sergeant Heaton doing that here (indeed they did an extensive internal investigation into Mr. Elias's case which included multiple supervisors reviewing all the videos) and FCPS did nothing.

111.  Throughout the month of May 2022, KDVR reporter Rob Low continued requesting records and asking questions about the Harris Elias arrest. In response, FCPS's public

relations officer would promise answers and then after 7-10 days, would supply responses to only some of the questions reporter Low had asked.

112.    Reporter Low told FCPS he was going to run a story on the Elias arrest and asked if Chief Swoboda wanted to be interviewed or provide any comment. Chief Swoboda enthusiastically agreed to an on-camera interview on May 25. In that interview, he defended Haferman's arrest decision and made knowingly defamatory statements towards Mr. Elias, like: "It's concerning that later it came back that he [Elias] didn't consume any, but that doesn't mean the officer didn't smell alcohol inside the car or on his breath or on his person."

113.    FCPS Chief Swoboda also claimed that FCPS had initiated their own internal review of the Elias arrest specifically "before" his interview on May 25 because they "always" do that in a case with "none detected" blood results.

114.    Yet the audit trail for Haferman's BWC video of the Elias video reveals that Kim Cochran, the Professional Standards Unit (PSU) officer at FCPS who would have done such a review, did not look at Haferman's Elias arrest video for the first time until 4 days later, on May 29, 2022.

115.    While investigating and asking questions for his story on Mr. Elias's wrongful arrest, reporter Rob Low began to see that this was not a one-off type of wrongful arrest, but that Officer Haferman instead appeared to have a pattern of making many wrongful DUI arrests of citizens. There were many more victims. He and other news outlets began digging in, demanding answers, explanations, and accountability from FCPS.

116.    In response to this additional media scrutiny, FCPS PR Manager Kimble again reiterated to Rob Low of KDVR in a June 14, 2022 email that "FCPS reviews all cases where DUI blood tests come back with no drugs detected."

117.    On June 16, 2022, Fox 31 Denver ran its first piece about Haferman pattern of wrongful DUI arrests. It gave FCPS Chief Swoboda opportunity to be interviewed and comment on the story before it was published and this time, he refused to be interviewed.

118.    Instead, knowing this story was coming out, Chief Swoboda worked to get ahead of it, releasing the day before, on June 15, 2022, a statement to the public through a video post on FCPS's Facebook page.

119.    In this statement, Swoboda defended Haferman's conduct, insulted and defamed the victims of Haferman's wrongful arrests, and made multiple other false claims suggesting that FCPS had always been reviewing Haferman's arrests and ensuring they were lawful. He also went even further than that, stating:

> As I've shared before, we do review DUI test results that come back showing no detection (ND) of impairing substances. If an officer has multiple ND results, we initiate a higher level of review to identify if there are training issues, policy violations, or other situational factors that may have influenced the outcome.

120.   By FCPS's Chief's own admission, then, either multiple FCPS supervisors were reviewing Haferman's ND cases and approving of it and finding no training issues and finding no discrepancies between his reports and his videos and finding no problem with his repeated destruction of video evidence by failing to activate it or muting it during some of his most questionable arrests…. Or, he was simply lying about there having been any supervisory review of any of Haferman's wrongful arrests.  The latter possibility is better corroborated by the evidence and logically considerably more likely, but regardless, either option establishes *Monell* liability against Defendant FCPS.

121.   FCPS Chief Swoboda, in the same public statements, also went even further to defend Haferman's wrongful arrests – claiming that Haferman always had probable cause to arrest the individuals and that if nothing impairing was found in their blood, that was simply the result of limitations on what drugs CBI could test for.

   a.   For example, Swoboda wrote on FCPS's Facebook page in the 6/15/22 statement:

> Our DUI blood tests are sent to Colorado Bureau of Investigation for analysis. CBI uses a standard ELISA panel to test for 14 categories of drugs. While this can detect some common substances, it isn't all-encompassing. For example, aerosol inhalants, which are often abused by people trying to get high, get metabolized extremely quickly and may not show up on a DUI blood test. The illicit drug industry has also evolved to produce synthetic street drugs, many of which aren't detected by the standard ELISA panel.

   b.   This paragraph openly insinuates that "nothing detected" blood test results for individuals charged with DUI by officer Haferman proves not that these people are innocent, but instead that Officer Haferman was so special and so highly trained that he was able to detect in them impairment from obscure and unknown types of street drugs for which science hasn't yet even figured out how to test.

   c.   Not one single "none detected" wrongful DUI arrest made by Officer Haferman up to that point ever included any allegation, insinuation, or shred of evidence supporting the idea that the individuals were impaired by a synthetic street drug or impairing aerosol inhalant.

   d.   FCPS Chief Swoboda's allegation that the innocent people wrongfully arrested by Haferman like Plaintiff Mr. Groves, who had been previously vindicated through their blood tests, were not innocent but instead just on drugs that CBI could not test for was defamatory and served to compound their damages. Chief Swoboda making these comments both online, in print, and in in-person interviews with the media caused Mr. Groves more suffering, trauma, and emotional distress.

122.   FCPS Chief Swoboda's claims to the public about FCPS's drug testing capabilities were also knowingly *untrue* at the time they were made. Here's the rest of the statement he made about FCPS's drug testing capabilities:

> In serious cases like vehicular assault and vehicular homicide, our CRASH team does submit blood tests for a more advanced "TOF" screening through the CSU toxicology lab (this is permitted as it exceeds the testing capability that CBI has available). This testing is reserved for cases involving serious injury or death. While it would be ideal to run every DUI sample through the TOF screening, it would be cost prohibitive -- in 2021, our agency made 504 DUI arrests. This specialized testing typically ranges from around $400-$700 (depending on the number of drugs being tested), which would incur more than a quarter of a million dollars in testing fees alone.

123.  Also provably untrue from Chief Swoboda's public statements:

a.  CBI is <u>not</u> limited to a "standard ELISA panel to test for 14 categories of drugs." In fact, CBI can test for every kind of drug for which a test exists.

b.  For example, in Harley Padilla's case, FCPS asked CBI to test for a whole slew of additional prescription medications outside of the standard ELISA 14-drug panel, and CBI did so.

**Result Statements:**

Item 1.1: Ethanol/Volatiles analyzed by HS-GC/FID to include the following:  Ethanol, Acetone, Difluoroethane, Isopropanol, and Methanol/Formaldehyde.

Item 1.1: Drugs of Abuse Screen analyzed by ELISA to include the following:  Barbiturates, Benzoylecgonine (Cocaine), Benzodiazepines, Buprenorphine, Cannabinoids, Carisoprodol/Meprobamate, Fentanyl, Methadone, Sympathomimetic Amines (Methamphetamine, Amphetamine, MDMA, & MDA), Opiates (Codeine, Morphine, Hydrocodone, Hydromorphone, Oxycodone & Oxymorphone), Tramadol, & Zolpidem.

Item 1.1: Atypical Antipsychotic Screen analyzed by LC/MS/MS to include the following: Asenapine, Aripiprazole, Brexpiprazole, Iloperidone, Lurasidone, Quetiapine, Risperidone, 9-Hydroxyrisperidone, Vilazodone, and Ziprasidone.

Not Analyzed:

c.  This "specialized testing" was done at CBI, not CSU, and this "specialized testing" did not cost FCPS anything additional to have completed.

d.  Similarly, in Harris Elias's case, FCPS asked CBI to test for apparently every single drug or medication that can be tested for on earth:

**Result Statements:**

Item 1.1: Ethanol/Volatiles analyzed by HS-GC/FID to include the following:  Ethanol, Acetone, Difluoroethane, Isopropanol, and Methanol/Formaldehyde.

Item 1.1: Drugs of Abuse Screen analyzed by ELISA to include the following:  Barbiturates, Benzoylecgonine (Cocaine), Benzodiazepines, Buprenorphine, Cannabinoids, Carisoprodol/Meprobamate, Fentanyl, Methadone, Sympathomimetic Amines (Methamphetamine, Amphetamine, MDMA, & MDA), Opiates (Codeine, Morphine, Hydrocodone, Hydromorphone, Oxycodone & Oxymorphone), Tramadol, & Zolpidem.

**Not Analyzed:**

Item 1.2: Not analyzed.

**Additional Statements:**

Item 1.1: Prescription Drugs Screen* conducted by NMS labs (Horsham, PA) and analyzed by ELISA and LC-TOF-MS to include the following: Anti-histamines, Anti-depressants, Anti-tussives, Anti-seizures, Anti-psychotics, Pain Medication, Over-the-Counter Medication, Muscle Relaxants, Hallucinogens, Hypnosedatives, and Gabapentin.

124.   Swoboda made his false claim that FCPS could only test for the 14-panel of drugs provided in an ELISA panel on June 15, 2022. Harris Elias's blood test result showing that FCPS can, could, and did test for every other type of drug under the sun was provided to FCPS on March 4, 2022, and was part of the Elias arrest records in FCPS's possession.

125.   Swoboda also falsely claimed in his public statement on behalf of FCPS that CBI could not or would not test blood for synthetic street drugs. This was categorically untrue. From CBI Toxicology's own website:

**4.   What is going to be tested in these DUI/DUID investigations?**
  - As of July 1, 2019, all submitted cases will have a Blood Alcohol Concentration (BAC)/Volatiles analysis, and a 14 panel Drugs of Abuse (DOA) screen.  Submitted cases will also be analyzed for confirmations based on the 14 panel DOA screen.  The laboratory can perform other screens and confirmations based on the case history, the results of the BAC and DOA analysis, and/or the toxicologist's expert opinion.

126.   Swoboda's claim that CBI could or would not test blood for "aerosol inhalants" was also a provable lie. CBI states clearly on their website that they test for commonly abused inhalants:



127.   CBI's website also confirms that they do "specialized testing" for law enforcement in DUI/DUID cases upon request, **at no cost**, for all the synthetic street drugs that the standard ELISA panel does not detect. The list of drugs that CBI can test for law enforcement in DUI cases upon request, for free, is so long that it would not be productive to copy and paste here, however it is worth pointing out that this list of hundreds of types of drugs[5] includes:

        1.   All synthetic fentanyl drugs; and
        2.   All synthetic bath salt type of drugs.

---

[5] The list is currently viewable (as of March 28, 2023) online at:
https://cbi.colorado.gov/sections/forensic-services/toxicology-services/toxicology-testing

b. In other words, if law enforcement suspects there is some other type of drug on board not likely to be detected in a standard 14-panel ELISA screen, they are expressly informed by CBI that specialty testing can be done to detect *any other drug that science has been developed to test for*, *including synthetic street drugs*, upon request and free of charge.

128.  This information is also provided directly to individual law enforcement officers in CBI's toxicology testing form. This document is part of every blood testing kit and is filled out by the officers themselves in every single DUI blood test case.

a. Swoboda's claim that only CSU could conduct such specialized testing was therefore knowingly false when uttered.

b. Swoboda's claim that such testing was expensive and only could be pursued in "serious cases like vehicular assault and vehicular homicide" was therefore also knowingly false when uttered.

129.  Chief Swoboda made these knowingly false claims in order to ratify and defend Haferman's constitutional violations, and at the time he made such false statements to the public and press, he knew or reasonably should have known that spreading such lies would cause Plaintiffs like Mr. Groves further harm, suffering, and distress.

130.  **All CBI drug testing is *free*.** Swoboda's claim in his June 2022 public statements that in order to do "specialized testing" for other drugs outside the ELISA panel, it would have cost FCPS "more than a quarter of a million dollars in testing fees" for its past year of 504 DUI arrests was also knowingly and provably false when uttered. CBI states on their website and on the drug test request forms in every blood kit that it has been completing specialized drug testing for law enforcement in DUI/DUID cases for free since July 2019:

### CBI Toxicology – Frequently Asked Questions (FAQs)

1.  **Why is CBI able to offer no cost Toxicology services at this time?**
    - Colorado legislators agreed to fund the cost of toxicology, thereby allowing the CBI to eliminate the fee we previously charged.

2.  **Who is eligible to submit to CBI for the no cost Toxicology services?**
    - Law Enforcement Agencies:  DUI/DUID, DFSA investigations, and other criminal investigations.
    - Coroner/Medical Examiners:  Medicolegal death investigations.
    - CBI toxicology cannot accept parole/probation, defense testing, and workplace drug samples at this time.

3.  **When can we start submitting to CBI for no cost Toxicology services?**
    - If the offense date is July 1, 2019 @ 0000 hours and later, toxicology testing will be performed at no cost.

131.  Swoboda made these false claims in the same public statement that accused the innocent people who had come forward about their wrongful DUI arrests at the hands of Haferman of doing a "quick hit news story" that was misleading and he urged everyone to "not fall for the salacious headlines." In fact, it was only Chief Swoboda who undertook to deliberately report to the public misleading and false facts.

132.  In a video address to the public accompanying this public statement on June 15, 2022, Chief Swoboda made this statement:

"In some of these [DUI] blood tests, they are coming back that no drugs were detected. We look at each and every one of these cases to make sure that we

are out there operating appropriately. Is there training issues? Is there equipment issues? What's happening? So please, don't fall for the salacious headlines. Don't think that when those reports come back or you see that in the media, that somehow it means it was bad policing. Our officers are routinely interacting with people that are on drugs or misusing drugs that don't show up in those panels. Things like inhalants, having people huffing and then driving a vehicle. Those don't show up in those panels. We also don't have over the counter drugs that show up. Or some prescription drugs that show up. And lastly and most importantly, synthetic drugs. That's a market that is changing daily and the testing isn't keeping up. So I just wanted all of you to know that when you see reports about zero drugs coming back in someone's blood after arrest, please ask questions if you have them but don't make the leap that it's somehow bad policing."

133.   Chief Swoboda knowingly lied in his video statement to the public. CBI does test for the inhalants used in huffing. It does this testing upon request in DUI/DUID cases and for free. FCPS was not "looking at each and every one of th[o]se cases to make sure that [they] are out there operating appropriately." Swoboda made the above statement despite knowing that he and FCPS had literally zero evidence or support for the idea that the "none detected" blood test DUI cases involved drugs that CBI was unwilling to test for, that were too expensive to test for, or that forensic science was not yet capable of testing for.

134.   It should also be noted that if any FCPS officer or supervisor believed that a "none detected" blood test result was due to other impairing drugs not checked in the 14-panel screen (rather than being due to the person's actual innocence), **the blood could be retested or subjected to specialized testing for any and all other drugs at any time for a year or more after the date of the arrest**. This is because CBI by rule maintains the blood samples from DUI arrests for at least one year and longer if needed or requested.

   a.   At the time that Chief Swoboda made these deliberately false and misleading statements to the public claiming that all "none detected" blood test cases were due to drug testing limitations and not driver innocence, **nearly all of those drivers' blood samples were thus still in refrigeration at CBI, perfectly preserved, and available for any manner of free specialized drug testing**.

   b.   At the time Chief Swoboda made these knowingly false and misleading statements to the public about drug testing limitations, Plaintiff Mr. Groves's blood vials were in fact in the state's possession, 100% available for FCPS to request any additional, free, more specialized drug testing on.

   c.   But rather than request any such testing, Chief Swoboda elected to lie to the public about nonexistent drug testing limitations and nonexistent drug testing costs instead.

135.   Further cementing Plaintiff's failure to supervise *Monell* claims, in the internal affairs investigation FCPS eventually did open into him, Haferman openly admitted that no one was supervising him at FCPS for the entirety of his tenure there.

a. For example: it is FCPS written policy that all arrest reports including all important information needed to be completed by officers by the end of their shifts.

    i. Haferman did not comply with this written policy. He was completing his reports sometimes days or even weeks later.

    ii. When interviewed by FCPS's "Professional Standards Unit" (PSU) for the internal affairs investigation into his wrongful DUI arrests, Haferman was questioned about his failure to comply with this written policy. Haferman told investigator Kim Cochran that reports did *not* need to be completed by end of shift at FCPS and in fact in his "entire career at FCPS," it was "never mentioned by any supervisor that he needed to complete reports by the end of shift." He went on and on about this written policy not being actual policy followed by anyone at FCPS and he informed Cochran that he "has never had a supervisor speak to him about getting reports done in a timely manner."

b. Also throughout this interview with his own employer, Haferman would repeatedly claim that he had a great memory while in nearly the same breath refusing to acknowledge certain basic facts of his cases by claiming he could "not recall." He bragged that over the past two years as DUI Officer he took no notes during roadsides or any other part of the investigation and instead "most everything was done by memory." He stated this as a point of pride, reminding the investigator Cochran that no supervisor of his at FCPS had *ever* found any problem with that.

c. Haferman was questioned by investigator Cochran about his failure to activate his BWC and whether there had been prior instances of him doing so. To her face, Haferman lied and said he could recall no prior instances of him having to document that he had muted his camera or forgot to turn on his camera (in fact there were more than 6 such instances in just the previous year).

d. For all the instances in which Haferman quite confidently informed the FCPS investigator that he had never received any kind of supervisory direction suggesting he needed to do things differently, and conveniently, *only* for those instances, FCPS investigator Cochran found Haferman's statements to be "highly unlikely and inaccurate." For everything else, she presumed that Haferman was merely mistaken and not "intentionally lying."

e. Investigator Cochran then acknowledged just a few paragraphs later in her 68-page report on Haferman that there were "issues with Haferman's ability to give accurate testimony."

136. In the separate report produced as a result of the investigation into Haferman's conduct and testimony in Ms. Zimmerman's DOR hearing, the FCPS investigator (really having no choice at this point) had to make the finding that Haferman's arrest report did include false statements that were belied by his own videos. She reluctantly acknowledged that Haferman appeared to have "a disregard for accurate reporting and poor attention to detail."

137.    These are catastrophically dangerous traits for any police officer to have and both realities of which any supervising officer at FCPS would have discovered to be true about Haferman if they had been supervising anything he was doing starting in November 2020.

138.    An officer who has "a disregard for accurate reporting and poor attention to detail" is almost certain to also be an officer who makes wrongful arrests of innocent people. Particularly if that officer is given a job exclusively focused on making arrests for only one type of crime (DUI) where that one type of crime (unlike nearly every other type of offense in the Criminal Code) is also able to be charged based solely on the subjective opinion and claimed observations of the arresting officer.

139.    When interviewed by FCPS's Professional Standards Unit in the summer of 2022, Haferman further solidified Plaintiff's *Monell* claims, when he stated that throughout his tenure as the DUI Officer, he "believed he was doing good work" and "didn't have any reason to believe he wasn't doing good work based on no supervisors or experts in the field saying otherwise."

140.    In the course of FCPS's investigation into Haferman's misconduct, multiple FCPS officers admitted that Haferman's failure to administer the roadsides to drivers correctly was obvious and apparent on his videos.

141.    When interviewed by FCPS's Professional Standards Unit in the summer of 2022, Haferman openly stated that **he treated a driver's invocation of the right to remain silent as an indication of impairment** because it "showed poor judgment in how to interact with police."  He said this was also consistent with his training and experienced received at FCPS.

142.    In public statements to the press throughout the summer (as more Haferman victims came forward to various news outlets and additional stories about Haferman and FCPS's pattern of wrongful DUI arrests continued to run), both Chief Swoboda and FCPS's public relations officer continued to make knowingly false and defamatory statements insisting that Haferman had probable cause to make all of his arrests and insinuating that the drivers whose blood results came back with nothing detected were simply impaired by some other substance.

143.    These continued defamatory statements made by FCPS suggesting his arrest was lawful and that he had simply been on some kind of synthetic street drug or inhalant caused Mr. Groves to suffer additional emotional distress and further compounded his damages.

144.    On September 1, 2022, the Larimer County District Attorney sent a letter to Chief Swoboda referencing the fact that they had had several "previous discussions" concerning Haferman's integrity, judgment, and reliability, and now despite those "previous discussions," felt forced to conclude that Haferman "at minimum, has demonstrated a significant disregard for the integrity of his investigations and does not have a firm grasp of the impact of depriving our citizens of their liberty."

145.    On September 2, 2022, FCPS announced that they were putting Haferman on administrative leave.

146.    In December of 2022, Chief Swoboda made a public statement on FCPS's Facebook page again, this time to announce that Haferman had resigned. He then explained that when FCPS had actually reviewed his work (after being forced to by media inquiries in May), FCPS had realized Haferman was lying in his reports, doing roadsides incorrectly, and arresting people without probable cause.

147.    No one at FCPS ever interviewed any of the victims of Haferman's wrongful DUI arrests as part of their several-months long investigation resulting in a 68-page report.

148.    A reporter offered Chief Swoboda the opportunity to apologize to victims of Haferman's wrongful arrests, including Mr. Groves in particular. Chief Swoboda refused to issue any apology.

149.    To date, no one at FCPS has offered any apology to Mr. Groves or any other victims of Haferman's and its repeated wrongful DUI arrests.

150.    As a result of the Defendants' violations of his constitutional rights under both the U.S. and Colorado Constitutions, Plaintiff Mr. Groves has suffered damages, trauma, depression, upset, loss of sleep, loss of work, loss of happiness, embarrassment, disruption of family relationships, emotional distress, and a catastrophic loss of ability to feel safe, to trust law enforcement, and to drive anywhere without risking again his loss of liberty.

## <u>STATEMENT OF CLAIMS FOR RELIEF</u>

<u>FIRST CLAIM FOR RELIEF</u>
Section 13-21-131, C.R.S. – Arrest Without Probable Cause
Violation of Colorado Constitution, Article II, Section 7
(against Defendant Haferman)

151.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

152.    Section 13-21-131 of the Colorado Revised Statutes directs that any peace officer who "subjects or causes to be subjected, including failure to intervene, any other person to the deprivation of any individual rights … secured by the bill of rights, article II of the state constitution is liable to the injured party for legal or equitable relief or any other appropriate relief."

153.    Statutory immunities and statutory limitations on liability, damages, or attorneys fees do not apply to claims brought pursuant to § 13-21-131.

154.    Defendant Haferman was a police officer under Colo. Rev. Stat. § 24-31-901(3), employed by the City of Fort Collins and its Police Department at the time he wrongfully seized, arrested and maliciously prosecuted Mr. Groves.

155.    Officer Haferman did not at any time during his encounter with Mr. Groves have probable cause or reasonable suspicion or any other legally valid basis to believe that Mr. Groves had committed, was committing, or was about to commit any crime.

156.    Defendant Officer Haferman unreasonably seized and arrested Mr. Groves, in violation of his rights under the Constitution of the State of Colorado.

157.    Officer Haferman did not at any time have a warrant authorizing his seizure or arrest of Mr. Groves.

158.    Officer Haferman violated Mr. Groves state constitutional rights by engaging in an unlawful seizure of Mr. Groves that was objectively unreasonable in light of the facts and circumstances confronting them before, during and after his encounter with Mr. Groves.

159.    Defendant Haferman knowingly violated Mr. Groves individual rights as secured by the bill of rights of the Colorado Constitution.

160.    Defendant Haferman did not act upon a good faith and reasonable belief that his actions in seizing Plaintiff without probable cause or reasonable suspicion was lawful.

161.    The acts or omissions of the Defendant Haferman were the moving force behind, and the proximate cause of, injuries sustained by Mr. Groves.

162.    Defendant Haferman's wrongful arrest and humiliation of Mr. Groves caused him to experience extraordinary stress, expense, depression, terror and anxiety. The experience of this event caused and continues to cause Mr. Groves trauma and emotional distress, loss of any feeling of safety or security, along with all the other damages and injuries described herein.

<u>SECOND CLAIM FOR RELIEF</u>
42 U.S.C. § 1983 – Unlawful Arrest Without Probable Cause – Individual, Failure-to-Supervise/Train, Unconstitutional Pattern/Practice under *Monell*
Violation of Fourth Amendment, Due Process
(against Defendants Haferman, Sergeant Heaton, Corporal Redacted, and Fort Collins)

**HAFERMAN**

163.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

164.    The actions of Defendant Officer Haferman as described herein, while acting under color of state law, intentionally deprived Mr. Groves of the securities, rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, including his right to be free from unlawful seizure as guaranteed by the Fourth Amendment to the Constitution of the United States of America and 42 U.S.C. § 1983, in that Mr. Groves was arrested without a warrant and without probable cause to believe he had committed any offense.

165.   Defendant Officer Haferman knew that Mr. Groves was unimpaired and that he had no probable cause to arrest him and he did so anyway, with deliberate indifference to Mr. Groves's rights under the Fourth Amendment to the U.S. Constitution.

166.   Officer Haferman's arrest of Mr. Groves was objectively unreasonable in light of the facts and circumstances confronting him before, during and after this encounter.

167.   Officer Haferman's conduct described herein was attended by circumstances of malice, or willful and wanton conduct, which he must have realized was dangerous, or that was done heedlessly and recklessly, without regard to the consequences or the rights of others, particularly Plaintiff.

168.   Defendant Officer Haferman falsified his report regarding evidence of impairment to ensure that Plaintiff would be prosecuted for the DUI offense he had not committed.

169.   Defendant Officer Haferman caused Plaintiff to be arrested without probable cause or a warrant, and the false statements in his reports caused Plaintiff to be wrongly subjected to criminal prosecution. Defendant Haferman's actions were done with malice and caused Plaintiff damages.

**SERGEANT HEATON**

170.   Defendant Sergeant Heaton was responsible for supervising Defendant Haferman.

171.   Defendant Sergeant Heaton was also personally involved in several of Haferman's wrongful DUI arrests.

172.   Defendant Sergeant Heaton was able to observe that Haferman was wrongfully arresting people and charging them with DUI and instead of doing anything to intervene and stop the behavior, he instead expressly approved of it and at times even took measures to help Haferman in covering it up.

173.   If Defendant Sergeant Heaton had been fulfilling his duty to even intermittently review Haferman's work (particularly his repeated DUI arrests coming back with "none detected" blood results), he would have seen that Haferman was lying in his reports, falsifying impairment indicators, administering roadsides incorrectly, and regularly tampering with or otherwise muting/disabling his bodyworn camera in violation of FCPS policy and Colorado law.

174.   If Defendant Sergeant Heaton had been fulfilling his duty to even intermittently review Haferman's work, he would have noticed the dozens of red flags indicating that his intervention, supervision, and more was required to stop Haferman from his pattern and practice of arresting innocent people for DUI.

175.   Any reasonable supervisor in Sergeant Heaton's position would have recognized that Haferman was wrongfully arresting innocent people and regularly violating the constitutional rights of citizens several months before Haferman encountered Plaintiff Mr. Groves and subjected him to the same.

## CORPORAL REDACTED

176.   Defendant Corporal Redacted was also responsible for supervising Defendant Haferman.

177.   Defendant Corporal Redacted did nothing to actually supervise or monitor the work being done by Officer Haferman.

178.   If Defendant Corporal Redacted had been fulfilling his duty to even intermittently review Haferman's work (particularly his repeated DUI arrests coming back with "none detected" blood results), he would have seen that Haferman was lying in his reports, falsifying impairment indicators, administering roadsides incorrectly, and regularly tampering with or otherwise muting/disabling his bodyworn camera in violation of FCPS policy and Colorado law.

179.   If Defendant Corporal Redacted had been fulfilling his duty to even intermittently review Haferman's work, he would have noticed the dozens of red flags indicating that his intervention, supervision, and more was required to stop Haferman from his pattern and practice of arresting innocent people for DUI.

180.   Any reasonable supervisor in Corporal Redacted's position would have recognized that Haferman was wrongfully arresting innocent people and regularly violating the constitutional rights of citizens several months before Haferman encountered Plaintiff Mr. Groves and subjected him to the same.

## CITY OF FORT COLLINS

181.   Defendant City of Fort Collins is a governmental entity and municipality incorporated under the laws of the State of Colorado for purposes of liability under 42 U.S.C. § 1983 and the Fort Collins Police Services is a department of the City of Fort Collins. Defendant City of Fort Collins enforces local and state law through its law enforcement agency, the Fort Collins Police Services ("FCPS").

182.   Defendant Fort Collins had a duty to train and supervise Defendant Haferman.

183.   At all times relevant to this Complaint, Defendant City of Fort Collins employed and was responsible for the promulgation of policies, customs, practices and training of FCPS personnel, including Officers Haferman.

184.   Defendant Fort Collins was aware Defendant Haferman's propensity for wrongfully arresting citizens to increase his DUI arrest numbers, falsifying his reports, and had evidence of the same, and it chose to not just fail to remedy it, but to instead reward it, ensuring it would continue to occur.

185.   Both Fort Collins's failure to supervise and train Haferman, as well as its aforementioned unconstitutional customs/practices, were the moving force behind Mr. Groves's wrongful arrest.

186.   Defendant Fort Collins' actions and omissions violated Plaintiff's federal constitutional rights, and were a substantial and significant contributing cause and proximate cause of Plaintiff's damages.

187.   Defendant Fort Collins did not act upon a good faith and reasonable belief that their actions and omissions in failing to adequately train and supervise FCPS officers in this area was lawful.

188.   Defendant Fort Collins, through its Chief and policymaker Jeffrey Swoboda, made knowingly false and defamatory statements to the public in the aftermath of its wrongful arrest of Mr. Groves which exacerbated Mr. Groves's emotional distress, suffering, and damages by insinuating that he had been on some other kind of drug they couldn't test for and falsely suggesting that testing for those other drugs was too expensive for the agency (when the testing was free).

189.   These Defendants' conduct were the proximately cause of the injuries, damages, and losses to Mr. Groves described herein.

THIRD CLAIM FOR RELIEF
Section 13-21-131, C.R.S. – Violation of Due Process
*Malicious Prosecution*
Violation of Colorado Constitution, Article II, Section 25
(against Defendant Haferman)

190.   Plaintiff Mr. Groves incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

191.   Defendant Haferman was a police officer under Colo. Rev. Stat. § 24-31-901(3), employed by the City of Fort Collins at the time he wrongfully seized, arrested and maliciously prosecuted Mr. Groves.

192.   Section 25 of Article II of the Colorado state constitution guarantees to Mr. Groves the right to not be deprived of life, liberty or property, without due process of law.

193.   Defendant Haferman caused the criminal prosecution against Mr. Groves by falsifying and deliberately exaggerating the facts in his report and his Affidavit for Warrantless Arrest, in an effort to make it more likely to appear there had been probable cause for Mr. Groves's arrest, and providing those documents to the District Attorney.

194.   Defendant Officer Haferman's false allegations were the sole moving force behind the criminal prosecution against Mr. Groves, which included Mr. Groves being subjected to extremely oppressive and humiliating bond conditions as already detailed herein.

195.   Defendant Haferman's actions were done with malice.

196.   No probable cause supported the criminal charges Haferman brought against Mr. Groves.

197.   The criminal prosecution against Mr. Groves resolved in his favor when the Larimer County Court dismissed the case against him on August 10, 2022.

198.   Defendant Haferman's malicious and false prosecution of Mr. Groves caused him to suffer further trauma, damages, lost wages, suffering, depression, and despair.

<u>FOURTH CLAIM FOR RELIEF</u>
42. U.S.C. § 1983 – Malicious Prosecution
Fourth Amendment, Due Process Violations
(against Defendant Haferman)

199.   Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

200.   Defendant Haferman caused the criminal prosecution against Mr. Groves by falsifying and deliberately exaggerating the facts in his report in an effort to make it more likely to appear there had been probable cause for Mr. Groves's arrest, and providing those documents to the District Attorney.

201.   Defendant Officer Haferman's false allegations were the sole moving force behind the criminal prosecution against Mr. Groves.

202.   Defendant Haferman's actions were done with malice.

203.   No probable cause supported the criminal charges Haferman brought against Mr. Groves.

204.   The criminal prosecution against Mr. Groves resolved in his favor when the Larimer County Court dismissed the case against him on August 10, 2022.

205.   Defendant Haferman's malicious and false prosecution of Mr. Groves caused him to suffer further trauma, damages, lost wages, suffering, depression, and despair.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests this Court enter judgment in his favor and against Defendants, and award him all relief as allowed by law and equity, including but not limited to:

a.   Declaratory relief and injunctive relief, as appropriate;

b.   Actual economic damages as established at trial;

c.   Compensatory damages, including but not limited to those for past and future pecuniary and non-pecuniary losses, physical and mental pain, trauma, fear, anxiety, loss of enjoyment of life, loss of liberty, loss of sense of security, and other non-pecuniary losses;

d.   Punitive or exemplary damages for all claims as allowed by law in an amount to be determined at trial;

e.   Issuance of an Order mandating appropriate equitable relief, including but not limited to:

     i.    Issuance of a formal written apology from each Defendant to Plaintiff;

    ii.    The imposition of appropriate policy changes designed to avoid future similar misconduct by Defendants;

   iii.    Mandatory training designed to avoid and prevent future similar misconduct by Defendants;

   iv.    Imposition of disciplinary action against appropriate employees of Fort Collins;

f.  Pre-judgment and post-judgment interest at the highest lawful rate;

g.  Attorney's fees and costs; and

h.  Such further relief as justice requires.

**JURY DEMAND**

Plaintiff demands a jury trial on all issues so triable.

Respectfully submitted this 3rd day of May, 2023, by:

THE LIFE & LIBERTY LAW OFFICE LLC

**s/ Sarah Schielke**
Sarah Schielke, #42077
*Co-Counsel for Plaintiff*

HALTZMAN LAW FIRM, P.C.

**s/ Matthew Haltzman**
Matthew Haltzman, #47913
*Co-Counsel for Plaintiff*